Kevin Ruf (SBN 136901)
  *kruf@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Counsel for Plaintiff Haxton Masonry, Inc.

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAXTON MASONRY, INC., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RB GLOBAL, INC.; ROUSE SERVICES LLC; UNITED RENATLS, INC.; SUNBELT RENALS, INC.; HERC RENTALS INC.; HERC HOLDINGS INC.; H&E EQUIPMENT SERVICES, INC., and SUNSTATE EQUIPMENT CO., LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Haxton Masonry, Inc. ("Plaintiff" or "Haxton") brings this action on behalf of itself and a proposed class of individuals and entities that rent construction equipment in the U.S. Plaintiff seeks relief from Defendant RB Global, Inc. and its wholly owned subsidiary Rouse Services LLC ("Rouse"), as well as United Rentals, Inc., Sunbelt Rentals, Inc., HERC Rentals Inc., HERC Holdings Inc., H&E Equipment Services, Inc., and Sunstate Equipment Co., LLC (collectively, the "Rental Company Defendants" and, with Defendant RB Global, the "Defendants")— who conspired to artificially increase construction equipment rental prices nationwide in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. These allegations are made upon information and belief and based on the investigation of counsel, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.

## I. INTRODUCTION

1.    Plaintiff brings this action against Defendants for designing and implementing an unlawful cartel formed to increase the price of construction equipment rentals across the nation (the "Rouse Cartel"). The equipment at issue— lifts, bulldozers, excavators, backhoes, skid steers, compaction equipment, cranes, loaders, and the like—is used in residential and commercial construction and has many industrial applications. This equipment is commonly rented rather than

CLASS ACTION COMPLAINT

purchased,[1] and demand continues to shift from sales to rentals.[2] Defendants' cartel has artificially inflated the cost of renting construction equipment to individuals and entities like Plaintiff.

2.     Before the Rouse Cartel became active in 2011, the construction equipment rental industry was fragmented and marked by intense price competition. Each company acted independently, pursuing greater rental volume through lower pricing, which often led to broad industry-wide price declines.

3.     Since then, the Rental Company Defendants' collective market share has grown substantially—from controlling roughly one quarter of the industry to a dominant majority—as the industry has become increasingly concentrated.

4.     Recognizing their combined ability to influence pricing, the Rental Company Defendants realized that they had to work together to increase profitability. Despite the increased concentration in the industry, coordinated action remained

---

[1] *See* November 22, 2024 Podcast titled "Brad Spitzer: Rental and Used Sales Trends" ("The other thing is, rental penetration continues to grow. Back in 2010, about 40 percent of equipment was coming through the rental markets. Today, it's closer to 55 percent.").

[2] https://www.fortunebusinessinsights.com/construction-equipment-rental-market-102247 ("Hiring construction equipment offers a multitude of advantages, especially in light of the cyclical nature of the construction industry and prevailing economic conditions. Amidst increasing economic uncertainty and forecasts of a potential recession, numerous construction firms, contractors, and industries are increasingly turning to rental options. Notably, platforms such as BigRentz report a significant shift from outright equipment purchases to rental models among contractors and builders. This shift indicates a growing trend toward cost-effective and flexible solutions in response to economic fluctuations.").

challenging prior to the emergence of the Rouse Cartel. This was due to (a) logistical complexities, including the wide variety of equipment, diverse rental terms, and number of market participants; and (b) enforcement difficulties, as each company still had a strong incentive to undercut others by offering lower prices to capture more business.

5.    To overcome these impediments to collective action Defendants turned to emerging technology. As the former HERC President stated in a September 2010 article titled "The Clock is Ticking on Rate Discipline:

> The pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted. Poor rate management caused it, and proper rate management can stop it. . . . I am challenging the entire rental industry to show leadership on rates, and every company to take a critical look at its rate practices, or risk failing itself and the industry. . . . Fortunately, there is a wealth of technology available today to help manage rental rates. If utilized properly, with tiered checks and balances, these software programs can bring genuine discipline to rate management. . . . *Right now*, the industry has an opportunity to move toward a more profitable rate platform, using the fulcrum of current capacity and increased demand.[3]

6.    The Rouse Cartel allows equipment rental companies to overcome their collective action problem by collecting and distributing confidential rental data from the Rental Firm Defendants and other rental equipment providers, which facilitates the collective setting of supracompetitive rental rates.

7.    The Rouse Cartel is a continuing horizontal agreement among the Rental

---

[3] https://www.rermag.com/business-technology/business-info-analysis/article/20937427/the-clock-is-ticking-on-rate-discipline

Company Defendants to suppress price competition and inflate rental rates. The reciprocal exchange of competitively sensitive information ("CSI") acts as the primary mechanism to facilitate this *per se* unlawful cartel.

8.      Membership in the Rouse Cartel requires rental companies to provide Rouse with their CSI.  Rouse collects this data daily from hundreds of companies—including the Rental Company Defendants—and uses it to generate a uniform, real-time price benchmark known as the Rouse Rental Insights price ("RRI Price") for each piece of rental equipment.

9.      Rouse then uses the RRI Price to guide and standardize pricing behavior, promoting price setting at or above the benchmark. This practice discourages price competition and reinforces consistent, coordinated upward pressure on rental rates across Rouse's client base.

10.      The Rental Company Defendants knowingly joined the Rouse Cartel with the understanding that Rouse would aggregate their CSI to establish and maintain supracompetitive prices in the construction equipment rental market. No individual Defendant would have an economic incentive to unilaterally share its most commercially sensitive information unless it expected its horizontal competitors to do the same—and to collectively benefit from higher pricing.

11.       Rouse markets its revenue management software and RRI Price as tools to increase rental rates above competitive levels, warning companies of the risks of relying on limited data and anecdotal information. This messaging is a veiled

reference to the benefits of participating in a coordinated pricing scheme based on pooled competitor data.

12.    Existing Rouse clients openly praise the platform for enabling them to raise rates, eliminate concessions, and avoid being underbid. These endorsements implicitly encourage others to join the Cartel and reap the same benefits. Rouse regularly publicizes the number of companies participating in its platform  and markets the value of competitor participation, signaling to prospective clients that joining the Cartel offers protection from price competition in exchange for contributing CSI.

13.    Rouse holds regularly meetings with clients' companies—including the Rental Company Defendants— to advise them on leveraging the RRI Price and other tools to implement and sustain higher prices.

14.    Participants in the Rouse Cartel value the RRI Price for its price transparency, which acts as a safeguard against price erosion. Cartel members routinely align their pricing within the range set by the RRI benchmark, reinforcing coordinated behavior across the market.

15.    The formation of the Rouse Cartel precipitated a fundamental shift in pricing strategy by the Rental Company Defendants. In the words of a former CEO of a large construction equipment rental company, the industry has become "much more disciplined" on pricing, "knowing that going to the lowest price was not the best strategy," because everyone "use[s] Rouse." He went on to explain:

I don't believe we're in a race to the bottom, not anymore at least. Rouse has essentially ***standardized a lot of the price competition*** in the industry. Since their involvement, rates have significantly increased. The larger rental companies, in particular, have become more stable in their pricing and show a desire to increase prices.[4]

16.    The Rouse Cartel has yielded substantial financial benefits for its members, who have reported record profits in recent years—profits achieved at the expense of Plaintiff and the Class.

17.    By their actions, Rouse and the Rental Company Defendants have violated, and continue to violate, U.S. antitrust laws. Rather than independently determining rental rates, the Rental Company Defendants—who collectively dominate the U.S. construction equipment rental market—have delegated pricing authority to a common entity: Rouse. By doing so, they have effectively eliminated competition among themselves.

18.    The plaintiff was injured as a result of the actions of the Defendants and brings this action to recover damages, trebled, as well as injunctive and other appropriate relief, detailed *infra*, on behalf of itself and all others similarly situated.

## II. JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because this action arises out of Section 1 of the Sherman Antitrust Act (15

---

[4] https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition (emphasis added).

6

U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

20.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A).

21.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in this state, including through the rental of construction equipment products.

22.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of construction equipment products.

23.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

### III. PARTIES

24.     Plaintiff Haxton Masonry, Inc. ("Haxton") is a commercial masonry and concrete contractor incorporated and headquartered in Arizona. Haxton is also registered to do business in California and Nevada and does business in Arizona, California, and Nevada. Haxton provides pre-construction services and schedule-driven projects for homeowners and businesses. Haxton regularly rents construction

equipment from several large construction equipment rental companies, including one or more Defendants.

25.    Defendant RB Global, Inc. ("RB Global") is a public company, traded on the Toronto and New York Stock Exchanges, that is legally domiciled in Canada with headquarters at 2 Westbrook Corporate Center, Suite #1000, Westchester, Illinois 60154. It describes itself as "a leading global marketplace that provides value-added insights, services, and transaction solutions for buyers and sellers of commercial assets and vehicles worldwide." In 2022, the company reported $6 billion in Gross Transactional Value.

26.    Defendant Rouse Services LLC ("Rouse") is a wholly-owned subsidiary of RB Global, and is headquartered at 8383 Wilshire Boulevard, Suite 900l, Beverly Hills, California 90211. RB Global acquired Rouse in 2020 for $275 million. According to the public filings of its parent, Rouse is "the leading provider" of "construction equipment market intelligence" and "rental metrics benchmarks, and construction equipment valuations to lenders, rental companies, contractors and dealers." Its "business model is built upon an extensive data ecosystem, proprietary analytics, data science techniques, and trusted consumer relationships rooted in service and confidentiality" and "provides complete end-to-end asset management, data-driven intelligence, and performance benchmarking system." According to Rouse's website, its Rouse Rental Insights ("RRI") product "provides Cat-Class level

comparisons of rental rates, utilization, and other key performance metrics" for rental companies.

27.    Defendant United Rentals, Inc. ("United Rentals") is a public company incorporated in Delaware with its principal place of business at 100 First Stamford Place, Suite 700, Stamford, CT

28.    United Rentals is the largest equipment rental company in the world, with over 1,400 retail locations across North America, including in California. United Rentals controls around 20% of the market for equipment rentals nationwide.

29.    United Rentals has enjoyed record-setting profits year after year. For the full year 2024, United Rentals reported total revenue of $15.345 billion, a 7.1% increase from 2023. In 2024, the company also achieved an annual gross profit of $6.15 billion, marking a 5.8% increase from $5.813 billion in 2023.

30.    United Rentals acquired Ahern Rentals in 2022 for approximately $2 billion. At that time, Ahern was the largest independently owned rental company in North America and had a fleet of 60,000 across 106 locations. United Rentals is also currently seeking to acquire Defendant H&E, as discussed below. These are only the latest in a long series of acquisitions by United Rentals. In 2017, United Rentals acquired two of the top ten rental companies in the U.S., both of which had been members of the Rouse Cartel since its creation in 2011: NES Rental Holdings II, Inc., acquired for $965 million, and NEFF Corporation, acquired for $1.3 billion.

31.     Defendant Sunbelt Rentals, Inc. ("Sunbelt Rentals") is incorporated in North Carolina and maintains its principal place of business at 1799 Innovation Point, Fort Mill, North Carolina 29715. As the country's second largest equipment rental company, Sunbelt Rentals has 1,186 locations in the U.S. and offers over 14,000 types of equipment for rent.

32.     Sunbelt Rentals is publicly traded on the London Stock Exchange under the name Ashtead Group. Ashtead does business in Canada and the United Kingdom as well.

33.     In 2024, Sunbelt Rentals reported $9.3 billion in revenue from its U.S. business alone. Its U.S. fleet is worth over $15 billion.

34.     Sunbelt Rentals, like United Rentals has also been active in acquiring other equipment rental companies. Over the last six years, Sunbelt Rentals has made ~150 acquisitions.

35.     Defendants HERC Rentals Inc. and HERC Holdings Inc. (together, "HERC Rentals" or "HERC") are public companies incorporated under the laws of Delaware with their principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134. The majority of HERC Rentals' business is in equipment rental, but the company also engages in sales of used rental equipment and new equipment, parts, and supplies.

36.     HERC Rentals has over 451 locations in the U.S. and Canada. Its fleet represents a total original equipment cost of $7 billion.

37.     In 2023, HERC Rentals reported a total revenue of $3.3 billion. Its revenue from equipment rental had grown 46% from 2021. And in 2024, its total revenue again jumped, to a record $3.6 billion.

38.     HERC Rentals has focused on M&A and new greenfield development in recent years. It has completed 42 strategic acquisitions since December 2020. HERC has also recently become involved in a bidding war for Defendant H&E, as discussed below.

39.     Defendant H&E Equipment Services, Inc. ("H&E") is a publicly traded company incorporated in Delaware with its principal place of business at 7500 Pecue Lane, Baton Rouge, Louisiana 70809. H&E is over sixty years old and concentrates its business on four categories of rentals: (1) hi-lift or aerial work platform equipment; (2) cranes; (3) earthmoving equipment; and (4) industrial lift trucks. The company provides rental, sales, parts, repair and maintenance functions for these equipment categories.

40.     H&E has 160 locations across the U.S. As of December 31, 2024, H&E owned 63,630 pieces of equipment with an original acquisition cost of approximately $2.9 billion.

41.     In 2023, H&E reported a revenue of $1.47 billion, with equipment rentals making up over half of its gross profit.

42.     In January 2025, H&E entered into an Agreement and Plan of Merger with United Rentals. In February 2025, HERC made what H&E's board determined

to be a "Superior Offer"— valued at $5.3 billion. H&E terminated its Agreement with United Rentals and entered into a new Agreement to merge with HERC. The proposed merger is currently under regulatory review.

43.    Defendant Sunstate Equipment Co., LLC ("Sunstate") is incorporated in Delaware and has its principal place of business at 5552 E. Washington Street, Phoenix, Arizona 85034. Sunstate is a wholly-owned company of Sumitomo Corporation Group, which is publicly traded on the Tokyo Stock Exchange and listed through an American Depositary Receipt on the New York Stock Exchange.

44.    Sunstate is now among the largest rental equipment companies in the U.S. The company has approximately 100 branches in sixteen states. Like the other Defendants, Sunstate has made a series of acquisitions of other rental companies over the years, and its profits and revenues have grown over time.

## IV. AGENTS & CO-CONSPIRATORS

45.    Numerous co-conspirators, some known and some anonymous, willingly took part in and acted in promotion of the alleged conspiracy.

46.    Each Defendant was a co-conspirator with the other Defendants and committed overt acts in promotion of the conspiracy alleged herein in the U.S. and in this District.

47.    Defendants took part in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates,

subsidiaries, and companies they acquired through mergers and acquisitions, for whom they are liable.

48.    At all relevant times, other known and anonymous corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Several individuals and entities actively took part in, during the course of, and in promotion of, the course of action described herein.

49.    Whenever reference is made to an act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## V. FACTUAL BACKGROUND

### A.    The Construction Equipment Rental Industry

50.    The construction equipment rental sector represents a substantial segment of the broader construction equipment industry in the U.S, driven largely by the need for access to heavy machinery and equipment without the burden of upfront capital investment.

51.    Rented construction equipment is used across residential, commercial, and industrial sectors, and includes—though it is not limited to—lifts, bull, excavators, backhoes, skid steers, compaction equipment, cranes, and loaders. Within

the industry, "construction equipment" generally refers to large, heavy machinery and its major components, rather than smaller tools or accessories.

52.    Demand for rental equipment remains strong and consistent. In fact, rental companies account for approximately one-third of all construction equipment purchases in North America.

53.    Renting equipment is often a more economical action—particularly for smaller companies or short-duration projects—than purchasing outright. Ownership requires a significant initial investment as well as long-term storage and maintenance expenses. In contrast, renting allows customers to pay only for the time the equipment is in use, preserving capital for other operational needs.

54.    The construction equipment rental market has undergone increasingly consolidation, primarily through aggressive acquisition practices. United Rentals, for example, has completed approximately 300 acquisitions over the past two decades. Sunbelt Rentals has made more than 100 acquisitions since 2015. Currently, HERC and United Rentals are engaged in a bidding war to acquire H&E.

55.    Below is a graphic from an investor presentation by Ashtead Group (Sunbelt's parent) which demonstrates that the industry substantially consolidated between 2010 and 2022.



56.    As demonstrated by the figure below, by 2025, the Rental Company Defendants accounted for the majority of construction equipment rental activity in the U.S., which is the world's most consolidated construction equipment rental market.[5]



---

[5] https://www.internationalrentalnews.com/newsnews/trendlines-rental-dominance/8040110.article?zephr_sso_ott=MTReoz

**B.    Historically, Rental Companies Used Cost, Inventory, and Demant to Set Prices Independently**

57.    Prior to Rouse's dominance in the industry, construction equipment rental companies – acting independently – determined pricing based on cost structures and market demand.

58.    Companies, including the Rental Company Defendants, traditionally calculated rental rates by assessing the total cost of owning and operating equipment. This included factors such as acquisition costs, maintenance, insurance, and other overhead. A standard markup was then applied to ensure profitability, typically varying by equipment type but often using a uniform percentage across categories. Inventory levels and local demand conditions also influenced final pricing decisions.

59.    Pricing structures were generally straightforward, offering fixed daily, weekly, and monthly rates. Daily rentals were the most expensive on a per-day basis, while longer rentals offered price breaks. Despite occasional periods of price volatility, rates overall remained relatively stable.

60.    When Rouse began using pooled CSI to set prices, the industry was transformed.

**C.    Rouse Becomes Involved In Rental Pricing**

61.    In 2011, the American Rental Association ("ARA"), the trade group for the equipment rental industry—in collaboration with Rouse and other major rental companies—announced the publication of ARA Rental Market Metrics, a white paper

outlining industry standards for calculating and reporting equipment rental company performance metrics.

These metrics codified, for the first time, industry standards for such measurements as physical utilization, dollar utilization, and fleet age for the express purpose of allowing rental businesses to assess their performance relative to their peers. This laid the groundwork for collusion that would prevent price competition and maintain high rental prices.

**D.    Rouse's Equipment Rental Pricing Platform Launches and Expands**

62.    Rouse's equipment rental pricing platform, which included the RRI Price, was launched by the end of 2011. Initially branded as "Rouse Analytics," the service was later renamed "Rouse Rental Insights."

63.    Rouse Analytics launched with Defendants HERC Rentals, H&E, and United Rentals as its founding members. Three additional early participants—Ahern Rentals, NES Rentals, and NEFF Rentals—were later acquired by United Rentals. By the end of 2011, Rouse had fully integrated its system into these founding members' data infrastructures, enabling them to begin systematically pooling their CSI.

64.    By 2015, Rouse had expanded its client base to include over 50 rental equipment company clients participating in its "Rental Metrics Benchmark Service." This service generated the collective RRI Price using CSI from the Rental Company Defendants and other participating firms. To accelerate growth and broaden data collection, Rouse initially offered a "free" tier of membership, providing companies

17

with monthly summaries of local market conditions in exchange for their granular transaction-level data. Rouse touted this growth publicly, stating:

> The rapid growth of our Rental Metrics Benchmark Service demonstrates how valuable this information is to rental companies, and we're looking forward to additional growth here in the U.S. and internationally.[6]

And as further reported in industry publications, Rouse Analytics collects invoice-level transaction data and nightly fleet snapshots from participating rental companies. It then delivers industry benchmarks on key performance indicators—including rental rates, physical utilization, dollar utilization, fleet age, and more—on a localized market basis. Participating companies receive high-level monthly comparisons at no cost, with the option to purchase more detailed reporting.[7]

65.    RRI's adoption was self-reinforcing: as more rental companies contributed their CSI, Rouse's pricing benchmarks became increasingly accurate, influential, and widely adopted. By 2020, Rouse's RRI Price had become dominant within the industry.

**E.    Rouse's Expansion Following Acquisition by Ritchie Brothers**

66.    In December 2020, Ritchie Brothers—a global leader in heavy

---

[6]    https://www.rermag.com/news-analysis/headline-news/article/20950099/rouse-analytics-rental-benchmark-service-tops-50-participants

[7] *Id.*

18

equipment sales, acquired Rouse.[8] Known for its extensive marketplace, Ritchie Brothers operate both physical and online auctions, connecting buyers and sellers across industries such as construction, agriculture, mining, and transportation. In press releases, Rouse announced that its integration with Ritchie Brothers would enhance its data analytics and service offerings.[9]

67.    As Ritchie Brothers evolved, the company recognized a major shift in the equipment market: more businesses were opting to rent rather than purchase construction equipment. This trend prompted Ritchie Brothers to focus more on serving the rental sector and its increasing need for sophisticated price-optimization and fleet-management solutions. The acquisition of Rouse was a strategic move to strengthen its offerings in the expanding equipment-rental market.

68.    Through this acquisition, Rouse was able to integrate its advanced analytics capabilities into Ritchie Brothers' substantial infrastructure, significantly expanding the reach and impact of the RRI program. Leveraging Ritchie Brothers' established footprint and asset management expertise, Rouse gained the ability to deliver more comprehensive, influential solutions to equipment rental companies, thereby increasing its dominance and ubiquity across the industry.

---

[8] In 2023, Richie Brothers changed the name of its corporate entity to RB Global.

[9] https://www.rouseservices.com/rouse-joins-worlds-leading-equipment-auction-company-ritchie-bros/

69.    The acquisition also allowed Ritchie Brothers to expand its customer base by gaining deeper access to rental companies that already relied on Rouse's tools for pricing strategy and fleet optimization. By acquiring Rouse, Ritchie Brothers positioned itself to offer these clients a full spectrum of services, including analytics, fleet management, and buy-sell capabilities through its existing auction and marketplace platforms.

70.    By 2022, Rouse's client base—which may include users beyond its analytics services) accounted for 90% of the total revenue earned by the top 100 companies in the Rental Equipment Register ("RER"). By 2024, more than 400 rental companies across North America used RRI, including all 10 of the top 10 70 of the top 100 companies in the RER rankings. According to Rouse, its database now encompasses at least 60% of the North American rental equipment market, with those companies both contributing CSI and relying on the RRI to inform pricing decisions.

71.    Defendant RB Global actively promotes its subsidiary Rouse as a provider of rental rate and utilization benchmarking intelligence aimed at helping rental companies increase their profitability.

**F.    Rouse Uses Pooled CSI  to Generate Collective Pricing**

72.    Rouse's RRI Price has become a pervasive and influential benchmark across the construction equipment rental industry.

73.    To create the RRI Price, Rouse requires its clients—which include the majority of equipment rental companies in the U.S.— to submit every line item from

each customer invoice on a daily basis, along with real-time utilization data for their entire fleet. Rouse integrates directly with the Rental Company Defendants' software systems, enabling it to automatically and continuously collect actual rental transaction data and inventory information. This ensures the data remains current and never becomes outdated.

74.    Rouse collects $75 billion worth of equipment fleet data nightly.[10] The rental invoices it captures contain CSI including details on equipment utilization, age, value, rental duration terms, and—most critically—pricing. All of this data is proprietary and non-public.

75.    Rouse standardizes this incoming data by aligning it with ARA Metrics and then applies a proprietary formula to produce the RRI Price. This formula incorporates the pooled CSI, Rouse's own analysis of market demand seasonality, and its interpretation of current market conditions. The resulting RRI Prices is shared uniformly with Rouse's clients, who all receive the same benchmark pricing derived from competitor data and Rouse's standardized methodology.

76.    Rouse provides RRI Prices by "Cat Class" (equipment category and class) and tailors the benchmarks to the client's specific local market. Clients receive detailed reports showing how their rates compare to competitors' prices across daily, weekly, and monthly rental terms. Rouse factors in highly specific CSI—such as the

---

[10] https://www.point-of-rental.com/introducing-rouse-rental-and-equipment-insights-your-premier-data-driven-solution-for-fleet-performance-benchmarking/.

exact age of individual equipment units—and also supplies benchmarks for ancillary revenue categories, including fuel surcharges, environmental fees, delivery and pickup costs, and damage waivers.

77.    The RRI Prices are updated continuously as new CSI is received. Clients are shown High, Medium, and Low RRI Price tiers for each rental category, along with clear indicators of how their own pricing aligns with the benchmarks. Rouse's website brags that it evaluates $52 billion in sales transactions annually.[11]

**G.    Rouse Actively Facilitates and Enforces Adherence to the RRI Price**

78.    Beyond simply providing benchmark pricing, Rouse equips its clients with tools and guidance specifically designed to implement, enforce, and maintain adherence to the RRI Price—thereby maximizing compliance and profitability across the industry.

79.    To ensure seamless integration and widespread adoption, Rouse's software interfaces directly with the most commonly used systems in the construction equipment rental industry. Recognizing the need to accommodate smaller, independent rental companies, Rouse developed a "plug-and-play" interface compatible with over 35 different enterprise resource planning (ERP) software vendors that serve the rental sector.

---

[11] https://www.rouseservices.com/solutions/rental-insights/

80.     This integration allows the Rental Company Defendants to dynamically set and adjust their pricing based on the RRI Price. Rouse also enables clients to view RRI benchmarks in the context of their own historical and real-time internal data, further embedding its pricing model into day-to-day operations.

81.     Members of the Rouse Cartel gain significant insight into market behavior through Rouse's reporting tools. These tools provide detailed analytics based on pooled CSI, covering seven core performance metrics: (1) rental rates, (2) changes in rental rates, (3) physical utilization, (4) financial utilization, (5) fleet age, (6) revenue distribution, and (7) rental growth. This data is broken down by equipment class, offering granular operational visibility.

82.     Rouse enhances enforcement by offering automation tools that help impose the RRI Price. These include a mobile application, pricing alerts, and software-integrated, self-populating pricing fields, which make it easier for companies to maintain conformity with Rouse's benchmarks.

83.     Rouse also promotes internal policing mechanisms. It provides ongoing monthly training sessions and supplemental tools to ensure participating rental companies continue adhering to RRI pricing standards.

84.     The Rental Company Defendants operate sophisticated sales organizations overseen by analytics teams that manage pricing strategies, compensation structures, and territory assignments. These teams rely on Rouse and the RRI Price as part of their daily workflow.

23

85.    Further reinforcing compliance, Rouse tracks and reports on individual salespeople who fail to meet RRI benchmarks. Clients are trained to use this reporting to monitor performance and apply corrective action where needed, helping ensure pricing discipline throughout the organization.

86.    In many cases, sales personnel are compensated based on their success in achieving or exceeding RRI Price thresholds. Rouse actively encourages clients to incorporate RRI metrics into their salesforce management and oversight systems.

87.    Rouse business analysts also work directly with clients to promote ongoing compliance. These analysts answer questions, provide guidance on using the RRI Price to maximize profitability, and assist with implementation and updates— ensuring that client operations remain aligned with Rouse's pricing framework.

88.    Rouse also facilitates the anticompetitive scheme by fully integrating with third-party software providers to allow direct transmission of data into rental management software used by rental companies.[12]

## VI. DEFENDANTS' ANTICOMPETITIVE SCHEME

89.    The Rouse Cartel has existed since at least 2011, with the express purpose of inflating construction equipment rental rates. To achieve this, the Rental Company Defendants—working in concert with Rouse, which coordinates the scheme—have agreed to: (1) delegate their rental pricing decisions to a common

---

[12] https://www.rouseservices.com/solutions/rental-insights/.

24

entity, Rouse, and adopt its Rouse Rental Insights ("RRI") Price; (2) share competitively sensitive information ("CSI") regarding pricing and equipment utilization with Rouse and each other; and (3) permit Rouse to oversee pricing coordination and enforce implementation strategies among co-conspirators. This combination of joint delegation and information exchange enables Rouse to centrally manage rental behavior and drive industry-wide price increases.

## A.    Certain Defendants Engaged Rouse to Establish Industry Pricing—Rouse Invited Others to Join

90.    The RRI Price emerged in direct response to growing industry demand in the late 2000s for more disciplined pricing strategies.

91.    United Rentals, HERC, and H&E were closely involved in the early development of Rouse's pricing services. A former HERC executive publicly articulated the industry's need for coordinated pricing in a 2010 statement that served as a call to action:

> The pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted. Poor rate management caused it, and proper rate management can stop it. . . . I am challenging the entire rental industry to show leadership on rates, and every company to take a critical look at its rate practices, or risk failing itself and the industry. . . . Fortunately, there is a wealth of technology available today to help manage rental rates. If utilized properly, with tiered checks and balances, these software programs can bring genuine discipline to rate management. . . . *Right now*, the industry has an opportunity to move toward a more profitable rate platform, using the fulcrum of current capacity and increased demand.[13]

---

[13]https://www.rermag.com/business-technology/business-info-analysis/article/20937427/the-clock-is-ticking-on-rate-discipline.

92.     Rouse required its initial clients to participate in the exchange of non-public CSI, including detailed pricing and fleet inventory data, as a condition of access to its services.

93.     After launching the RRI Price in 2011, Rouse expanded the Cartel by inviting additional rental companies—including Sunstate and Sunbelt—to join and contribute their CSI to the collective database.

94.     A 2020 Rouse advertisement made clear that the purpose of its platform was to replace independent pricing decisions with coordinated benchmarks:

> Making critical decisions about rental rates and fleet management can be risky when you rely solely on limited data and anecdotal information from your customers and sales reps. They can't help you see the complete picture and understand what is happening in the market, but we can. We're Rouse Analytics and we use actual rental invoices and daily fleet snapshots to provide rental business managers with the most accurate benchmark data available on rental rates and utilization by product and market. Easy to set up and simple to use. Our actionable intelligence is based on nightly fleet snapshots for over $45B worth of equipment and $20B in rental revenue. Our online portal is intuitive and designed for speedy analysis. And with automatic alerts and email notifications, it works for you even when you are not actively using it. . . . When you sign up with Rouse Analytics, we give you a 60 day free benchmark trial with access to all available subscription and benchmark reporting, including detailed local market level rate comparisons by product. . . . Contact us now to schedule a demo!

95.     To both attract new Cartel members and maintain the participation of existing ones, Rouse routinely publicizes the number of rental companies using its platform. This marketing tactic serves as an inducement to join, signaling to prospective clients that their competitors are already participating and that success in raising prices requires collective action. Rouse and the Defendant Rental Companies understand that the profitability of the scheme—and its ability to sustain

supracompetitive prices—depends on widespread industry adoption. Rental companies engage with Rouse not for individualized insights, but because (1) their competitors are also participating, and (2) only through coordination can they raise prices without losing market share.

**B.     Why Other Rental Companies Accept Rouse's Invitation to Collude**

96.     Rental companies joined the Rouse Cartel by accepting Rouse's implicit offer: contribute competitively sensitive information ("CSI") in exchange for the ability to raise rental rates without the risk of being undercut by competitors.

97.     Founding members of the Rouse Cartel included United Rentals, HERC, and H&E, all of whom joined at the platform's inception in 2011. Sunstate joined in 2015, followed shortly thereafter by Sunbelt.

98.     Participation in the Cartel requires rental companies to provide Rouse with extensive CSI, including invoice-level pricing, fleet utilization data, and other non-public information. Rouse explicitly confirms on its website that it "[pulls] data directly from our clients' systems to ensure our rate benchmarks are based on actual rental invoices billed to customers, not list rates or quoted rates." Rouse further acknowledges that it "provides clients with comparisons of rental rates, utilization, and other key performance metrics to industry benchmarks by Cat Class specific to each market they operate in."

99.     No rental company acting in its unilateral self-interest would share such sensitive, proprietary data with a central third party unless it was assured that (1) its

competitors were similarly contributing their own CSI, and (2) none of the participants would use that data to engage in competitive price-cutting.

100.   These companies knowingly contribute their CSI to Rouse because they understand that Rouse will use the pooled data to coordinate pricing strategies among co-conspirators, thereby enabling them to jointly fix and increase rental prices.

101.   Participating rental companies further signal their commitment to the Cartel by aligning their own pricing with Rouse's RRI benchmarks, rather than setting prices independently.

102.   In addition, companies demonstrate their active participation in the scheme by monitoring internal compliance with the RRI Price—rewarding sales personnel who meet or exceed Rouse's pricing targets and using adherence to RRI as a metric for performance evaluation.

## C.    Rouse's Impact: Industry-Wide Price Increases and Anticompetitive Effects

103.   The implementation and widespread adoption of Rouse's RRI Price has fundamentally reshaped the construction equipment rental market. Industry participants, including Rouse and the Rental Company Defendants—have openly acknowledged that the RRI pricing system has led to higher prices and diminished output, hallmark indicators of anticompetitive effects.

104.   As rental companies increasingly align their pricing with Rouse's benchmarks, pricing across the industry has converged. This uniformity eliminates

natural pricing variation, suppresses competitive strategies, and reduces meaningful differentiation among rental providers.

105.   A May 2023 statement by the CFO of HERC Rentals illustrates this industry shift: "You have sort of 50% to 60% of North American rental companies reporting into Rouse . . . . And that certainly goes to the discipline in the overall marketplace in the industry . . . . I think it's invaluable."

106.   Representatives from numerous rental companies—including the Rental Company Defendants, frequently tout Rouse as the tool that enables them to optimize pricing while staying aligned with market-wide trends. These endorsements underscore the coordinated nature of pricing behavior enabled by Rouse.

107.   Rouse calculates the RRI Price using a proprietary formula applied to real-time, pooled competitively sensitive information (CSI) from the Rental Company Defendants, combined with its own analysis of demand seasonality and market conditions. The result is standardized, elevated pricing across the industry. As more rental companies adopted these benchmarks, they began setting prices at similar, elevated levels, thereby restricting price competition and generating supracompetitive profits for Cartel members.

108.   RRI pricing suppresses market competition by encouraging rental companies to follow a common pricing framework rather than tailoring rates based on individual business costs, local demand, or competitive positioning. This

coordination discourages undercutting and price-based competition, leading to artificially inflated rental rates.

109.   Members of the Rouse Cartel have reported record-breaking financial performance in recent years. According to Rouse, the combined revenue of the top 10 companies listed in the *Rental Equipment Register* (RER)—all of whom are Rouse clients—increased by nearly $5 billion from 2022 to 2023 alone.

110.   United Rentals reported a 7.1% year-over-year revenue increase between 2023 and 2024.

111.   Similarly, Sunbelt Rentals has experienced significant profit growth and has credited "rate discipline" as a key factor in its success. Brendan Horgan, CEO of Ashtead Group (Sunbelt's parent company), remarked: "Importantly, rental rates have continued to progress year-on-year, doing so despite industry utilization levels still lagging highs reached in previous years. This is again affirmation of the ongoing good rate discipline in the industry as a result of the ever-clear structural progression that we've experienced over the years."[14]

112.   HERC Rentals also saw substantial gains, reporting a 46% increase in revenue from its equipment rental segment between 2021 and 2023.

---

[14]    https://equipmentfinancenews.com/news/rentals/sunbelt-rental-revenue-rises-amid-persistent-large-rental-activity/.

113.   The chart below[15] illustrates the rapid revenue growth experienced across the rental equipment market—further evidence of the financial rewards reaped by Cartel members through coordinated pricing practices.



Source: S&P Global Market Intelligence, ARA Rentalytics

114.   Total U.S. revenue for the industry has nearly doubled in only six years, from approximately $15 billion in 2018 to approximately $30 billion in 2024, outpacing overall construction spending during the same time period.[16]

---

[15]      https://news.ararental.org/equipment-rental-industry-projected-to-experience-softening-growth

[16]   https://knowledge-leader.colliers.com/vytas-norusis/the-inside-scoop-on-outdoor-storage-the-evolution-of-the-equipment-rental-market/.

115.   Rouse enabled rental companies to achieve record profits even in periods of declining output. Notably, during the COVID-19 pandemic and the associated economic downturn, the equipment rental sector continued to outperform expectations. Unlike the broader construction industry and equipment retail markets, rental companies—supported by Rouse's pricing system—remained profitable, surprising industry analysts.

116.   Since 2020, major rental companies have sustained elevated pricing levels despite fluctuations in supply. On earnings calls, company executives acknowledged that the industry had undergone a fundamental transformation due to the widespread adoption of data-driven pricing and increased "discipline." Executives from Defendant companies explained that following the adoption of RRI Pricing, they were now willing to accept reduced time utilization rather than lower their rental rates—a shift from historical practices. They remarked that "time utilization [was] down, but [rental] rate[s were] up," a scenario that "wouldn't have happened 15 years ago," before the formation of the Rouse Cartel.

117.   This shift was further underscored at a May 2022 Bank of America conference, where HERC Rentals CEO Lawrence Silber responded to a question about maintaining elevated pricing levels. He explained:

> The difference between a company today and what it was maybe 10 years ago or even five years ago is we're technology enabled. We're really at the forefront and leadership level of having all the equipment be telematically enabled . . . . In fact, Rouse Analytics, which is a key tool that we use to help us price in the marketplace, helps us manage a level of fleet that's in the market, understand what competition – it has over 60% of the market participating, now putting data into that.

32

118.   This coordinated approach defies the logic of independent competitive behavior. No rational company acting in its unilateral self-interest would (1) share its most competitively sensitive information with rivals, or (2) deliberately maintain high prices while accepting reduced utilization—unless it could be confident that competitors were pursuing the same strategy. Such conduct only makes economic sense within the context of a coordinated pricing agreement like the Rouse Cartel.

## VI. DIRECT AND INDIRECT EVIDENCE OF THE ROUSE CARTEL EXISTS

### A.    Direct Evidence of the Rouse Cartel

### i. Rouse's Contracts with Rental Equipment Companies

119.   Upon information and belief, Rouse has entered into substantially similar agreements with hundreds of construction equipment rental companies, including each of the Rental Company Defendants. These contracts provide direct documentary evidence of the alleged conspiracy.

120.   The agreements expressly provide that participating rental companies will: (1) contribute CSI to Rouse, including data that is pooled with that of their competitors; (2) access and use the RRI Pricing benchmarks generated by Rouse using that pooled data; and (3) adopt Rouse's pricing tools in setting their own rental rates.

### ii. Statements by Rouse, the Rental Companies, and Other Industry Participants

121.   Rouse and the Rental Company Defendants have publicly acknowledged core components of the conspiracy—namely, the centralized exchange of CSI and the industry-wide coordination of pricing facilitated through Rouse.

122.   Rouse actively markets itself as the exclusive provider of real-time, invoice-based benchmarking data, derived from over 400 companies representing more than $115 billion in fleet value and $49 billion in annual rental revenue.[17] Rouse promotes this data as being sourced from "actual rental invoices sent to customers—not quoted or list rates"—emphasizing that its tools enable rental companies to make the "most profitable decisions" in the industry.[18]

123.   In 2024, Rouse boasted that 74 of the top 100 rental companies listed in the RER relied in its services to "make better business decisions"[19] and "maximize their return on assets."

124.   A November 22, 2024 podcast, Brad Spitzer, Director of Client Services at Rouse, made the following admission:

> "Q: It's impressive when you say that you have the data of all, not some, but all of the national rental companies. . . .
>
> A: I think it helps out the entire industry really by allowing people to have more visibility into their performance and their market and react and make better decisions. And then also help train their salespeople to you know not always listen to their customers and listen to the data and the market around them."

125.   Rouse maintains longstanding relationships with both the American Rental Association (ARA) and the *Rental Equipment Register* (RER), leveraging those affiliations for marketing and outreach. Rouse also maintains a visible presence

---

[17] https://www.rouseservices.com/solutions/rental-insights/

[18] *Id*.

[19] https://www.rouseservices.com/category/uncategorized/

at industry conferences, where it promotes its services as tools to increase pricing and improve efficiency.

126.   A Former Vice President of the ARA commented:

> They've [rental companies] become more professional, using more data tools. They have shareholders who care about keeping the price higher. Both United and Sunbelt have consistently led in saying, 'We're going to raise prices, we're going to get prices higher.' So, everyone knows what United is doing.[20]

127.   Ashtead   Group   CEO   Brendan   Horgan   similarly   acknowledged coordinated pricing behavior, stating:

> Importantly, rental rates have continued to progress year-on-year, doing so despite industry utilization levels still lagging highs reached in previous years. This is again affirmation of the ongoing good rate discipline in the industry as a result of the ever-clear structural progression that we've experienced over the years.[21]

### iii.    Private Communications Between Rouse and Members of the Cartel

128.   Internal communications and client interactions confirm that Rouse's business model is designed to promote coordinated action. As described above, Rouse not only collects CSI from participating companies and generates unified pricing benchmarks, but it also actively informs clients about which other companies are participating, what pricing strategies they are using, and how to align with those strategies. Rouse acts as a central conduit to harmonize behavior across the market.

---

[20]    https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition.

[21]       https://equipmentfinancenews.com/news/rentals/sunbelt-rental-revenue-rises-amid-persistent-large-rental-activity/.

129.   Rouse conducts ongoing marketing and client engagement initiatives, including regular trainings with the Rental Company Defendants and other clients.

130.   Rouse also provides continuing support and compliance training to sales and analytics personnel at client companies. It encourages the use of pricing enforcement tools, including performance tracking and alerts, to ensure adherence to RRI benchmarks. A private customer portal maintained by Rouse allows direct communication and guidance on implementing and maintaining the RRI Pricing strategy.

**B.     Indirect Evidence of the Rouse Cartel**

**i. Defendants Engage in Conduct Contrary to Independent Economic Self-Interest**

131.   The Rental Company Defendants—horizontal competitors in the construction equipment rental market—have each engaged in conduct that would be irrational or contrary to their unilateral economic self-interest absent a collusive agreement. These actions, which make sense only in the context of coordinated behavior, constitute strong circumstantial evidence of a horizontal price-fixing conspiracy.

132.   First, it is against the individual economic interest of any rental company to share its CSI—including proprietary pricing strategies, invoice data, and utilization metrics—with a common third party like Rouse, unless that company has assurances that its competitors will reciprocate. In the absence of an agreement to coordinate,

unilateral disclosure of such data would expose the company to undercutting and the risk of lost market share.

133.   Second, it is contrary to standard competitive behavior for companies to consistently raise prices without offering discounts or negotiating rates to attract or retain customers. In a competitive market, firms typically respond to market pressures by lowering prices, offering promotions, or customizing pricing to win business. The Rouse Cartel suppresses these natural competitive dynamics by discouraging rate concessions and enforcing uniform upward pricing pressure.

134.   Third, the Rental Company Defendants have adopted pricing strategies that prioritize high rates over equipment utilization—despite the fact that lower utilization, when undertaken unilaterally, would ordinarily result in decreased revenue and competitive disadvantage. Raising prices while allowing utilization to stagnate or decline only makes economic sense in the context of a cartel, where all major players agree to maintain similar pricing practices and refrain from competing on rate.

**ii. Parallel Conduct and Sudden, Industry-Wide Shift in Strategy**

135.   The growth and adoption of Rouse's pricing platform has coincided with a marked shift in the industry's pricing behavior. When Rouse launched its rental pricing service in 2011, it had only five participating companies. Today, more than 400 rental companies are members of the platform. Between 2019 and 2024 alone, Rouse's membership expanded by 150%.

37



136.   The broad industry adoption of Rouse's pricing platform—and the corresponding use of its RRI Prices—has had a significant and measurable impact on rental rates and industry revenues, as previously detailed. These pricing outcomes were not the result of independent business judgment or normal competitive market forces; rather, they were the product of coordinated conduct facilitated by Rouse.

**iii. The Market for Construction Equipment Rental is Susceptible to Collusion**

137.   The construction equipment rental market possesses several structural characteristics—commonly referred to as "plus factors"—that heighten the likelihood of collusion and facilitate the formation, maintenance, and success of a cartel. These factors include: (1) high barriers to entry; (2) high barriers to exit; (3) inelastic

consumer demand; (4) significant market concentration; (5) the fungibility of rental equipment; (6) regular exchanges of competitively sensitive information among horizontal competitors; and (7) numerous opportunities for coordination through trade associations and industry events.

138.   First, as previously discussed, entering the construction equipment rental market requires significant capital investment and the development of a customer base. These and other entry barriers limit the threat of new competitors who might otherwise undercut cartel pricing.

139.   Second, the market features high exit barriers. Contractors typically cannot switch rental providers mid-project without incurring substantial cost or delay. Moreover, when prices escalate, customers may have no feasible alternative providers within geographic proximity. As a result, customers are effectively locked into the offerings of Rouse Cartel members, even when faced with supracompetitive pricing.

140.   Third, demand for rental equipment is relatively inelastic. Purchasing equipment is generally not a viable substitute, particularly for small and mid-sized contractors. With no practical alternatives, renters are compelled to accept the rental terms offered—even when inflated through collusion.

141.   Fourth, the market is highly concentrated. A small number of companies dominate the space, with the top ten rental firms—including all Rental Company Defendants—controlling a substantial majority of the market. This concentration makes coordinated behavior easier to organize and sustain.

142.   Fifth, construction equipment is largely fungible. For example, one 2020 Caterpillar bulldozer is functionally indistinct from another of the same make and model. Customers rarely have meaningful product-level information to distinguish one rental source from another, which allows Rouse to standardize pricing by "Cat Class" across its platform.

143.   Sixth, the sharing of competitively sensitive information among rental companies—both directly and through Rouse—creates a fertile environment for collusion. As previously discussed, this behavior would be contrary to a company's unilateral self-interest absent a mutual agreement to fix prices.

144.   Seventh, Rouse and the Rental Company Defendants have numerous opportunities to coordinate their conduct. Rouse routinely sponsors and participates in industry conferences. For example, a Rouse executive recently sat on a panel titled "Leveraging Data and Technology to Increase Revenue and Improve Efficiency," where Rouse promoted the RRI system as a means for companies to "outperform competitors" through optimized pricing and fleet strategies.

145.   Finally, trade associations provide additional forums for collusion. Rouse and the Rental Company Defendants are active participants in the American Rental Association (ARA), which facilitates frequent interaction through training sessions, market research programs, and networking events. Rouse, Ritchie Bros., and the Rental Company Defendants also maintain memberships in other industry groups that offer further opportunities to align pricing strategies.

# VII. THE RELEVANT MARKET

146.   The relevant market for the claims asserted herein is the Rental Equipment Market used across construction, industrial. entertainment, and residential projects.

147.   This case involves a horizontal price-fixing conspiracy that is *per se* unlawful under the antitrust laws. As such, Plaintiff need not allege or prove market power. The purpose of the Defendants' arrangement—coordinated and facilitated by Rouse—is to enable horizontal competitors, including the Rental Company Defendants, to fix and inflate prices in the market for construction equipment rentals. The relevant product market is the rental of construction equipment. There are no reasonable economic substitutes for renting such equipment. Purchasing is not a viable alternative for most customers due to the prohibitively high capital costs associated with acquiring even a single piece of construction equipment. Moreover, construction projects typically require access to a diverse array of equipment types, which would be impractical and cost-prohibitive to own outright. Renting allows companies to obtain the specific equipment needed for each project on a flexible, short-term basis—avoiding the financial burden and logistical complexity of purchasing, storing, and maintaining a varied equipment fleet. Even a modest collection of construction equipment would entail millions of dollars in acquisition costs. Additionally, renting provides access to newer, more technologically advanced

equipment models, which would otherwise be unavailable to companies relying on older, previously purchased assets

148.   Renting construction equipment offers significant financial and logistical advantages over ownership. Rental companies typically cover the cost of maintenance and repairs—expenses that would otherwise fall to contractors if they owned the equipment. Rental payments are generally treated as tax-deductible operating expenses, thereby reducing a contractor's taxable income. In contrast, ownership entails the burdens of depreciation and capital investment, which can be substantial given the high cost of construction equipment. Renting also spares contractors from securing long-term insurance policies to cover theft or damage, as such coverage is typically included by the rental company. Additionally, renting eliminates the need for costly and space-intensive storage facilities.

149.   The relevant geographic market is the United States. The Rental Company Defendants are dominant national providers of construction equipment rentals and routinely transport equipment across state lines, serving customers throughout the country.

150.   The U.S. construction equipment rental market satisfies the federal antitrust agencies' market definition standard, commonly known as the Small but Significant and Non-transitory Increase in Price ("SSNIP") test. This test asks whether a hypothetical monopolist in the proposed market could profitably impose a small (typically 5%) but sustained price increase without losing so many customers

to alternative products or services that the price increase becomes unprofitable. If the price increase is profitable, the market is properly defined.

151.   In this case, the SSNIP test is clearly satisfied. Rental companies—including the Defendants, have been able to impose price increases of 5% to 12% annually without losing sufficient business to make those increases unprofitable. This pricing power exists precisely because of the coordinated agreement among competitors not to compete on price, reinforcing that the relevant product and geographic market is properly defined as the market for construction equipment rentals in the United States.

**VIII. DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET**

152.   To the extent that a rule of reason analysis requires proof of market power, the collective power of the Cartel members can be established through both direct and indirect evidence. Direct evidence includes their demonstrated ability to control prices and maintain them at supracompetitive levels, which eliminates the need to define the market with precision. Alternatively, indirect evidence—such as the Cartel members' collective share of the relevant market—also supports a finding of market power. Rouse executives have acknowledged that companies using the RRI platform—i.e., members of the Rouse Cartel—collectively account for at least 60% of the North American construction equipment rental market.

153.   The ability of Cartel members to impose sustained price increases well in excess of what a hypothetical monopolist could profitably achieve under the SSNIP

test further demonstrates their market power. Such coordinated pricing behavior would not be profitable absent significant market control. In a competitive market, unilateral efforts to charge supracompetitive prices would result in the loss of customers and market share—outcomes that the conspiracy enables participants to avoid.

154.  Rouse itself advertises that 74 of the RER Top 100 companies—and all of the top 10—use Rouse's pricing tools to set rental rates. Given that such a large portion of the market is controlled by Rouse-aligned companies, customers face few, if any, viable alternatives. This widespread dependence on Rouse's platform constitutes direct evidence of the Cartel's collective market power.

155.  Defendants Sunbelt and United Rentals are the two largest equipment rental providers in the United States, together controlling more than 30% of the national market. Collectively, the Rental Company Defendants dominate the industry, controlling a majority share of the construction equipment rental market—further underscoring their power to influence prices and restrict competition.

## IX. ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE

156.  The Rouse Cartel has directly harmed Plaintiff's business and property and has unlawfully restrained competition in the relevant market. As a result of Defendants' price-fixing conspiracy, Plaintiff has suffered—and continues to

suffer—economic damages, the full extent of which will be determined through discovery and proven at trial.

157. Absent Defendants' unlawful agreement, Plaintiff and the proposed Class members would have paid significantly less for construction equipment rentals. The overcharges resulting from supracompetitive pricing constitute a classic form of antitrust injury.

158. So long as the conspiracy persists, Plaintiff and the proposed Class will continue to incur economic harm.

159. The antitrust laws are designed to prevent precisely the kind of injury alleged herein: harm caused by an agreement among competitors to suppress price competition and artificially inflate the cost of goods or services—in this case, construction equipment rentals. Agreements to fix prices or otherwise reduce competition are *per se* violations of the antitrust laws.

160. Defendants' conduct, as alleged, has had a substantial effect on interstate commerce throughout the United States and has caused antitrust injury to Plaintiff and the members of the proposed Class.

## X. CLASS ACTION ALLEGATIONS

161. Plaintiff brings this action on behalf of itself, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that rented construction equipment from Defendants, or from a division, subsidiary,

predecessor, agent, or affiliate of such rental company, at any time during the period of March 31, 2021 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

162. The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

163. Plaintiff's claims are typical of those of the Class because Plaintiff presses the same legal theories, and seeks to redress the same injury, for itself as for all members of the proposed Class.

164. Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more to rent construction equipment than they otherwise would have in a competitive market.

165. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to the Class.

166. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be specific to individual class members, because the Defendants have acted and refused to act on grounds generally applicable to the Class.

167. Questions of law and fact common to the Class include:

a. Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price

and/or artificially suppress supply of construction equipment rentals from competitive levels;

b. If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;

c. If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of construction equipment from competitive levels;

d. The proper measure of damages; and

e. The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

168. Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

169. Class action treatment is the superior method for the fair and efficient adjudication of the controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or

entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## XI. CAUSES OF ACTION

### COUNT ONE
### Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act
### (15 U.S.C. § 1)

170.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

171.    Plaintiff seeks monetary and injunctive relief on behalf of itself and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

172.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in renting construction equipment to Plaintiff and the Class.

173.    Beginning in or around 2011, Defendants and their co-conspirators entered into and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

174.    Specifically, Defendants have formed a cartel to artificially inflate the price and/or decrease the supply of construction equipment rentals from competitive levels.

175.   Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

176.   Defendants have committed various acts in furtherance of this conspiracy, including, but not limited, to the following:

• Rouse created its RRI Price tool with Defendants United Rentals, HERC, and H&E as founding members;

• Rouse advertised and sold its pricing tool to additional rental companies as a means to raise prices and achieve greater profits;

• The Rental Company Defendants agreed to provide real-time, non-public, confidential, competitively sensitive, and detailed internal data to Rouse for use in Rouse's collective pricing;

• The Rental Company Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

• The Rental Company Defendants charged customers for rental equipment at the rate set by Rouse's pricing tool; and

• Rouse empowered the Rental Company Defendants to enforce the collective Rouse prices.

177. The Rouse Cartel has caused Plaintiff and the Class to suffer overcharge damages.

178. There are no procompetitive justifications for Defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

179. Defendants' cartel is unlawful under a *per se* mode of analysis. In the alternative, Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

180. As a direct and proximate result of Defendants' unlawful scheme, Plaintiff and members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and be deprived of the benefit of free and fair competition unless Defendants' conduct is enjoined.

181. Plaintiff and the proposed Class are entitled to recover three times the damages sustained by them and interest on those damages, together with reasonable attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

182. Plaintiff and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

**COUNT TWO**
**Violation of the Cartwright Act**
**(California Business and Professions Code §§ 16720 *et seq.*)**

183.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

184.   Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of the Cartwright Act, California Business and Professions Code §§ 16720 *et seq.*, by systematically exchanging competitively sensitive non-public information, and artificially increasing the rental price of Rental Equipment charged to Plaintiff and members of the Class.

185.   Defendants' activities constitute a *per se* violation of the Cartwright Act.

186.   Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of rental equipment at levels above what would have occurred if competition had prevailed. For this conduct, Plaintiffs and members of the Class are entitled to treble damages and injunctive relief pursuant to California Business and Professions Code § 16750(a).

**COUNT THREE**
**Violation of the Cartwright Act**
**(California Business and Professions Code §§ 17200 *et seq.*)**

187.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

188.   Defendants committed acts of unfair competition, as described above, in violation of the UCL.

189.   Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, violating the Sherman and Cartwright Acts, as set forth above;

190.   Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to the Plaintiffs and the members of the Class that is not "reasonably avoidable" by them.

191.   Defendants' conduct, as alleged herein, is and was contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

192.   Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies, as set forth in the Sherman Act, the Cartwright Act, and the California Corporations Code. Here, Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

193.   Defendants' conduct, as described above, also constitutes a "fraudulent" business practice within the meaning of the UCL. Defendants' systematic exchange of competitively sensitive non-public information artificially increased the rental price of Rental Equipment charged to Plaintiff and members of the Class. This

conduct was designed to deceive—and did deceive—other market participants about the true supply and demand situation for Rental Equipment in order to artificially increase the price of same.

194.   Plaintiff and the members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for Rental Equipment than they would have paid in a competitive market. They are therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code § 17203.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiff serving as the Class Representative and its counsel serving as Class Counsel;

B. Defendants have contracted, combined and conspired in violation of the Sherman Act and the Cartwright Act;

C. Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

D. Plaintiff and the Class are entitled to recover three-fold damages, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

E. Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

F. Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and

media designed to give immediate notification of this action and their rights to the Class members;

G. Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H. Plaintiff and the Class receive such other or further relief as may be just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Consolidated Amended Complaint that are so triable.

DATED: May 1, 2025

GLANCY PRONGAY & MURRAY LLP

By: _/s/ Kevin Ruf_

Kevin Ruf (#136901)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
kruf@glancylaw.com

Lee Albert (*pro hac vice* forthcoming)
Brian Brooks (*pro hac vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
lalbert@glancylaw.com
bbrooks@glancylaw.com

**GARWIN GERSTEIN & FISHER LLP**

Bruce D. Gerstein (*pro hac vice* forthcoming)
Deborah A. Elman (*pro hac vice* forthcoming)
Dan Litvin (*pro hac vice* forthcoming)
88 Pine Street, Suite 2810
New York, NY 10005
(212) 398-0055
bgerstein@garwingerstein.com
delman@garwingerstein.com
dlitvin@garwingerstein.com

*Counsel for Plaintiff and the Proposed Class*